IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

_____

No. 15-1112

_____

**FILED**

**June 13, 2016**

**released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel. WEST VIRGINIA DEPARTMENT OF
TRANSPORTATION, DIVISION OF HIGHWAYS,
Petitioner

v.

THE HONORABLE ROBERT A. BURNSIDE, JR.,
JUDGE OF THE CIRCUIT COURT OF RALEIGH COUNTY,
AND MCNB BANK AND TRUST CO.,
Respondents

_____

ORIGINAL PROCEEDING IN PROHIBITION

WRIT GRANTED

_____

Submitted: April 5, 2016
Filed: June 13, 2016

Leah R. Chappell
Adams, Fisher & Chappell, PLLC
Ripley, West Virginia
Counsel for the Petitioner

David Allen Barnette
Vivian H. Basdekis
Jackson Kelly, PLLC
Charleston, West Virginia
Counsel for the Respondent

JUSTICE BENJAMIN delivered the Opinion of the Court.
CHIEF JUSTICE KETCHUM concurs and reserves the right to file a concurring opinion.
JUSTICE DAVIS concurs and reserves the right to file a concurring opinion.
JUSTICE LOUGHRY dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1.      "'Prohibition lies only to restrain inferior courts from proceedings in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers, and may not be used as a substitute for [a petition for appeal] or certiorari.' Syl. Pt. 1, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953)." Syl. pt. 3, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).


2.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

Benjamin, Justice:

In this original proceeding, the Division of Highways ("DOH") of the West Virginia Department of Transportation petitions for extraordinary relief, seeking in the underlying condemnation matter to prohibit enforcement of the circuit court's order requiring it to deposit $1,012,500 before it is granted right of entry and defeasible title to certain commercial property owned by MCNB Bank and Trust Company. We agree with the DOH that it is entitled under the law to acquire the aforementioned right and title upon its deposit of the lesser sum of $417,100, and we therefore grant the requested writ of prohibition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At issue is 0.78 acres of realty adjoining Robert C. Byrd Drive in Beckley, West Virginia. For decades, the property was the site of a service station and automotive repair shop. The business required the installation of underground storage tanks ("USTs") for the purposes of dispensing gasoline and sequestering used oil. In 1986, Exxon Mobil Corporation owned the USTs, and the company filed a notification thereof with the West Virginia Department of Environmental Protection ("DEP"). Exxon Mobil removed the original steel USTs in 1988 and replaced them with fiberglass models, but an Environmental Assessment performed at the site in August 1991 revealed that petroleum hydrocarbons had seeped into the surrounding soil. Monitoring wells were thereafter installed to detect the range and intensity of the contamination. On November

1

27, 1991, Exxon Mobil conveyed the property by special warranty deed to H.C. Lewis Oil Co., which, on March 16, 1992, acknowledged its ownership of the USTs by filing the appropriate paperwork with the DEP. H.C. Lewis removed the fiberglass tanks in 1997.

On January 5, 2007, H.C. Lewis sold the property to Chrite Properties I, LLC, for $400,000. MCNB financed the purchase price and lent Chrite another $750,000 for improvements. Chrite built a Sonic fast-food restaurant at the site, much of which was paved with asphalt or covered with concrete in order to render it suitable for its intended use. Chrite eventually defaulted on the loan, however, and MCNB foreclosed on the property, which was conveyed to the bank by deed on October 10, 2013, for the stated consideration of $1 million.

Around the time of the foreclosure sale, the DOH decided to acquire 0.56 acres of the property to facilitate construction of a new highway to be known as the East Beckley Bypass. On May 20, 2014, the DOH applied to the circuit court to condemn the parcel and determine the compensation due MCNB. In so doing, the DOH elected to proceed using the "alternative method" prescribed by statute, which provides in pertinent part:

> Before entry, taking possession, appropriation, or use, the applicant shall pay into court such sum as it shall estimate to be the fair value of the property, or estate, right, or interest therein, sought to be condemned, including, where applicable,

the damages, if any, to the residue beyond the benefits, if any, to such residue by reason of the taking. . . .

Upon such payment into court, the title to the property, or interest or right therein, sought to be condemned, shall be vested in the applicant, and the court or judge shall, at the request of the applicant, make an order permitting the applicant at once to enter upon, take possession, appropriate and use the property, or interest or right therein, sought to be condemned for the purposes stated in the petition. . . . The title in the applicant shall be defeasible until the compensation and any damages are determined in the condemnation proceedings and the applicant has paid any excess amount into court.

W. Va. Code § 54-2-14a (1981).

In its verified Application, the DOH averred that MCNB had rejected its tender of $417,100, the details of which were set forth in an exhibit thereto:

| | |
|---|---|
| Fair market value of 0.56-acre parcel | $140,800 |
| Diminution in value of 0.22-acre residue | 136,200 |
| Temporary construction easement over residue | 3,200 |
| Restaurant machinery and equipment in place | 136,900 |
| TOTAL: | $417,100 |

With respect to the first three components of the DOH tender, that is, exclusive of the machinery and equipment fixtures, the $280,200 subtotal was considerably short of the combined $875,600 value arrived at by the agency's retained appraiser. The appraiser explicitly stated in his report, however, that the valuation was premised on the site being free from contamination. Accordingly, the difference of $595,400 corresponded to the estimated cost of environmental remediation to the site, which the DOH would have to absorb as a necessary precursor to the onset of road construction.

3

MCNB answered the Application on June 26, 2014, denying that $417,100 represented just compensation and asserting that the property's fair market value, as calculated by its own appraiser, was instead $1,294,100. MCNB's Answer incorporated its Third-Party Complaint for contribution and indemnification against Exxon Mobil and H.C. Lewis, which those parties each moved to dismiss. Upon receipt of the Answer, the DOH moved for an order in conformance with § 54-2-14a, authorizing it to enter the property and granting it defeasible title thereto upon deposit of the tender amount with the Circuit Clerk. That motion came on for hearing on August 28, 2014.

By its order entered September 18, 2015, the circuit court granted the DOH's motion, although it conditioned title and the right of entry on the deposit of the full amount of the agency's appraisal, with no deduction for the anticipated costs of environmental remediation. The circuit court's order thus directs the DOH to deposit not only the tender amount of $417,100, but also the $595,400 remediation estimate, for a total of $1,012,500. The order confirmed the circuit court's view that "[West Virginia Code §] 54-2-14a does not allow the [DOH] to deposit less than $1,012,500.00 in order to gain defeasible title and right of entry to the subject property." On November 19, 2015, the DOH filed the instant petition for extraordinary relief, seeking to prohibit

4

enforcement of the circuit court's order insofar as it requires the agency to deposit any funds in excess of its $417,100 tender.[1]

## II. STANDARD OF REVIEW

"'Prohibition lies only to restrain inferior courts from proceedings in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers.'" Syl. pt. 3, in part, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996) (quoting syl. pt. 1, in part, *Crawford v. Taylor*, 138 W. Va. 207, 75 S.E.2d 370 (1953)). A petition for a writ of prohibition "'may not be used as a substitute for [a petition for appeal] or certiorari.'" *Id.* (quoting *Crawford*). In *Hoover*, we set forth five factors to assist us in determining whether a lower tribunal has exceeded its legitimate authority such that we should exercise our discretion to grant extraordinary relief in prohibition:

> (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first

---

[1] On December 11, 2014, the circuit court granted the respective motions of Exxon Mobil and H.C. Lewis to dismiss the third-party claims against them, preserving MCNB's right to maintain those claims in an independent civil action. H.C. Lewis, which had filed a cross-claim against Exxon Mobil, agreed to voluntarily dismiss that claim without prejudice.

impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, in part, *id*.

# III. ANALYSIS

We begin with the general proposition that the sovereign authority, whether federal or state, may exercise its inherent power of eminent domain to acquire privately owned property for governmental use only to the extent that it fairly reimburses the owner for what is taken. That fundamental principle derives from the Fifth Amendment of the United States Constitution, which specifically prohibits the public taking of private property "without just compensation." U.S. Const. amend. V. Our State constitution similarly instructs that "[p]rivate property shall not be taken or damaged for public use, without just compensation." W. Va. Const. art. III, § 9.

In adherence to those constitutional commands, the Legislature enacted a comprehensive statutory framework regulating the public taking of private property. The procedural methodology thereby established in Article 2, Chapter 54 of the West Virginia Code strives to serve the societal interest in efficiently securing public infrastructure, an undertaking that "is so often necessary for the proper performance of governmental functions that the power is deemed to be essential to the life of the state." *State of Ga. v. City of Chattanooga*, 264 U.S. 472, 480 (1924). At the same time, the eminent domain

statute accommodates the constitutional preeminence afforded private property rights through the mandate of just compensation.

The prescribed procedure varies depending on whether the condemnation is sought by the State or by a private entity authorized under certain circumstances to take private property for public uses. Where a private entity is the condemnor, the associated public uses commonly include without limitation railroad lines, distribution networks for utilities, and oil or gas pipelines and storage facilities. *See* W. Va. Code § 54-1-2(a)-(c) (1979). The condemnor private entity must initiate proceedings by applying via petition in the circuit court. *See* W. Va. Code § 54-2-1 (1882). Upon satisfying itself that the proposed taking is for a public use and not otherwise prohibited, the circuit court proceeds to appoint disinterested freeholders as commissioners to determine just compensation and any related damages to be paid the condemnee property owner. *See id.* § 54-2-5 (1963). After considering the evidence and, if necessary, viewing the subject property, the commissioners prepare a report containing their findings. *See id.* § 54-2-9 (1963). Once the report has been submitted to the circuit court, the condemnor may gain entry to the property and put it to the use stated in the application upon payment of the amount ascertained by the commissioners, plus ten percent interest running from the filing of the initial petition. *See id.* § 54-2-13 (1981). In the meantime, if the condemnor

or the condemnee takes exception to the report, either may timely demand a jury trial of the matter. *See id.* § 54-2-10 (1967). [2]

By contrast, the State or any political subdivision thereof may proceed under either of two methods, neither of which requires access to and use of the subject property to be delayed until a commissioners' report has been prepared. Under the first, embodied in West Virginia Code § 54-2-14 (1981), the State may seek an order from the circuit court permitting it "to enter upon, take possession, appropriate and use the land sought to be condemned for the purposes stated in the petition." The same rights accrue to the State if it instead avails itself of the alternative method set forth in the companion enactment, West Virginia Code § 54-2-14a (1981), except that the court order shall, in addition, convey title to the property. The title vested in the State "shall be defeasible

---

[2] We recently explained in *West Virginia Department of Transportation, Division of Highways v. Western Pocahontas Properties, L.P.*, 236 W. Va. 50, 777 S.E.2d 619 (2015), that

> [t]he challenge in assessing just compensation in a condemnation case is this: what uses and factors would be considered in setting the market price by a willing buyer and a willing seller, each acting with complete freedom and knowledge of the property? Every element of value which would be taken into consideration between private parties in a sale of property should be considered in arriving at a just compensation for the land proposed to be taken. Conversely, considerations that may not reasonably be held to affect market value are excluded. Essentially, any factor that a reasonable buyer or seller would typically consider should be included in an analysis of fair market value.

*Id.* at 62, 777 S.E.2d at 631 (citations, internal quotation marks, and alterations omitted).

until the compensation and any damages are determined in the condemnation proceedings and the applicant has paid any excess amount into court." *Id.* Regardless of which method is employed to obtain the specified order, commissioners are subsequently appointed and a report is made, and, if dissatisfied, either the State or the property owner may resort to a jury trial. *See* W. Va. Code §§ 54-2-14, -14a.

The DOH here elected to proceed under the alternative method set forth in § 54-2-14a, seeking defeasible title to the MCNB parcel. In accordance with the statute, the DOH was first required to "pay into court such sum as it shall estimate to be the fair value of the property," plus the entirety of any anticipated damages to the residue. W. Va. Code § 54-2-14a; *see id.* § 54-2-14 (employing identical language with respect to the first method). The DOH takes the straightforward position that, inasmuch as the statute vests no one other than "it" with the prerogative to estimate fair value, the circuit court was without authority to condition issuance of the sought-after order on the deposit of a sum varying in any respect from its $417,100 tender.

Because it faithfully adheres to the statute's literal terms, we are convinced that the DOH's interpretation should be adopted as correct. *See State ex rel. State Rd. Comm'n*, 137 W. Va. 572, 576, 73 S.E.2d 432, 434 (1952) ("The jurisdiction of a circuit court over a proceeding in eminent domain is statutory, which statutes, under our practice, must be strictly construed." (citation omitted)); *cf. King v. W. Va.'s Choice, Inc.*, 234 W. Va. 440, 443, 766 S.E.2d 387, 390 (2014) ("[A] court's duty is not to construe

9

but to apply an unambiguous statute."). MCNB protests that the discretion afforded the DOH by the statute is not so absolute as to permit a tender that, it says, falls far short of the property's manifest value. Our condonation of the agency's approach would, according to MCNB, contravene its constitutional right to just compensation and effectively thrust upon it the costs of the environmental cleanup, a burden that MCNB contends cannot legitimately be imposed.[3]

MCNB's arguments ignore that there are two purposes to be served by the methodology inherent in the eminent domain statute. To be sure, the statute is designed to ensure just compensation for the property taken, but it accomplishes that end by virtue of the appointment of qualified commissioners, the preparation of a particularized report based on evidence obtained through the adversary process, trial *de novo* before a jury,

---

[3] According to MCNB, the State's interest in holding a landowner accountable for the costs of environmental cleanup is at its least where the landowner is not responsible for the contamination as a matter of fact or law. MCNB insists that liability for remediation is restricted to "owners" and "operators" of USTs, and that, being nothing more than an innocent "holder" of affected property, it cannot be designated a member of either category. *See* 40 C.F.R. § 280.220 (2015) (specifying that a holder is not an owner liable for cleanup so long as it does not participate in the management of the UST system or engage in petroleum production, refining, and marketing); 40 C.F.R. § 280.230(b)(1) (2015) (absolving holder from liability as an operator "if there is an operator, other than the holder, who is in control of or has responsibility for the daily operation of the UST or UST system and who can be held responsible for compliance with applicable requirements"). MCNB also cites a letter dated September 15, 2006, from the West Virginia Department of Environmental Protection ("DEP") in response to an inquiry from Chrite concerning the subject property, whereby a representative of the DEP's Office of Environmental Remediation opined that "[t]he responsible party for remediation of petroleum contamination associated with the confirmed release is the owner(s) of the underground storage tanks at the time of the confirmed release."

10

and the opportunity to appeal an adverse verdict. The expedited-entry provisions of West Virginia Code §§ 54-2-14 and 54-2-14a, however, facilitate the complementary purpose of ensuring that the subject property is efficiently acquired and converted to public use, without imposing unnecessary costs and delays on the sovereign. As such, those provisions admit of no room for an aggrieved landowner to preliminarily contend or to present evidence that the State's estimate of just compensation is substantively inadequate. Instead, those opportunities are properly limited to the subsequent proceedings before the commissioners. Even so, the incentive remains strong for the State to accurately calculate its tender, because if the amount ultimately allowed as just compensation—either by the commissioners' report or by a jury verdict—exceeds the estimate initially paid into court, the landowner is entitled to payment of the excess plus ten percent interest from the date of the petition. *See* W. Va. Code §§ 54-2-14, -14a.

Moreover, insofar as MCNB may ultimately sustain a loss with respect to its investment in the subject property, such loss will not be attributable to any expenditure relating to the parcel's contamination. Assuming that the DOH's estimate is reasonably correct, it is the agency that will instead spend in the neighborhood of $600,000 to remediate the parcel in preparation for the construction project. Were the DOH to pay the full amount of its $1,012,500 base valuation exclusive of cleanup costs as a prerequisite to access, it would yet be compelled to spend the same $600,000 on remediation, amounting to a total acquisition expenditure hundreds of thousands of dollars in excess of what even MCNB contends the property is worth. That excess would

11

not be recoverable in the subsequent proceedings under the particular facts of this case, given that whatever funds the DOH ultimately pays "as representing the fair market value of property to be acquired, the amount of the award or verdict pertaining to such property shall not be less than such sum." W. Va. Code § 54-3-4.[4]

---

[4] Sections 54-2-14 and 54-2-14a contemplate otherwise, as each instructs that "[i]f the amount which has been paid into court pursuant to this section exceeds the amount allowed by the report of the condemnation commissioners, or the verdict of a jury, if there be one, the excess shall be repaid to the applicant." Those parallel provisions were made part of the condemnation statute prior to the enactment of section 54-3-4, which was designed specifically to implement and accommodate the provisions of the federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 *et seq.* The federal act and its implementing regulations endeavor, *inter alia*, to protect persons and small businesses permanently displaced "as a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part for a program or project undertaken by a Federal agency or with Federal financial assistance." *Id.* § 4601(6)(A)(i) (1987). The revised Statement of Just Compensation and Summary prepared by the DOH in support of the agency's tender confirms that it was submitted "[i]n accordance with the provisions of" the federal act.

Section 54-3-4 thus imposed a floor on condemnation awards or verdicts contrary to the provisions of sections 54-2-14 and 54-2-14a. The conflict is readily resolved, however, as § 54-3-4 specifically directs that its award-or-verdict floor applies "notwithstanding any other provision of law," leaving no doubt of its primacy. *See Benjamin v. Walker*, No. 16-0228, 2016 WL 1619865 (W. Va. Apr. 19, 2016), at *__ (acknowledging that statutory directive applying "notwithstanding any other provision of law" is mandatory); *cf. State ex rel. City of Jennings v. Riley*, 236 S.W.3d 630, 632 (Mo. 2007) (en banc) ("[T]o say that a statute applies 'notwithstanding any other provision of the law' is to say that no other provisions of law can be held in conflict with it. Indeed, the 'Notwithstanding' clause does not create a conflict, but eliminates the conflict that would have occurred in the absence of the clause.")

The DOH also directs our attention to West Virginia Code § 54-2-16 (1981), which, like § 14 and § 14a, provides for the repayment to the condemnor of any amount deposited in excess of the eventual commissioners' report or jury award. By its terms, however, § 16 applies only to "such payment into court as is mentioned in section

(continued . . .)

12

In reaching our decision herein, we do not hold that the State's estimate pursuant to § 14 or § 14a is always insulated from review. Under exceedingly narrow circumstances, an aggrieved property owner may seek to have the tender set aside. The nature of such circumstances is indicated by resort to other aspects of the eminent domain statute. For example, where the commissioners' report is accepted by the parties without exception or jury demand, the circuit court may yet decline to confirm the report if "good cause be shown against it, or it be defective or erroneous on its face." W. Va. Code § 54-2-10 (1967). In an analogous context, the right of entry afforded a private condemnor upon payment of the just compensation ascertained by the commissioners may not be stayed or enjoined "unless it be manifest that the applicant is insolvent or that it or its [authorized representatives] are transcending their authority, or that such interposition is necessary to prevent injury which cannot be adequately compensated in damages." *Id.* § 54-2-13 (1981). We discern that a comparable standard should apply to the State's estimate in advance of entry. Thus, the preliminary estimate of just compensation formulated by the State or its political subdivision pursuant to West Virginia Code § 54-2-14 or § 54-2-14a may be challenged only in the most unusual of cases, *i.e.*, where it is facially or patently defective, the result of an *ultra vires* act, made in objective bad faith, or is otherwise justified by good cause.[5]

---

thirteen of this article." Because the scope of § 13 is limited to private condemnors, it is outside the reach of § 54-3-4, which applies strictly to public agencies.

[5] We make plain by our decision today that a mere disagreement concerning the substantive adequacy of the estimate does not constitute good cause sufficient to justify

(continued . . .)

The DOH's consideration of the costs of environmental remediation in formulating its estimate of just compensation was not beyond its authority, nor was it done in bad faith. Indeed, the DOH's evaluation is facially rational, and, as Chief Justice Ketchum explains more fully in his concurring opinion, it finds support in the custom and practice of other jurisdictions.[6] Inasmuch as no basis exists to disturb the DOH's just compensation estimate, the circuit court clearly erred as a matter of law in declining to issue the agency's requested order granting it the right of entry and defeasible title to the subject property upon the deposit of $417,100. The third *Hoover* factor thus strongly supports the grant of extraordinary relief, as do the first and second, given that the DOH

---

judicial intervention. *See Murray v. State Farm Fire & Cas. Co.*, 203 W. Va. 477, 485, 509 S.E.2d 1, 9 (1998) (instructing that proper application of the construction canons of *ejusdem generis* and *noscitur a sociis* leads to the conclusion that "in an ambiguous phrase mixing general words with specific words, the general words are not construed broadly but are restricted to a sense analogous to the specific words").

[6] The majority view is that evidence of environmental contamination and its associated cleanup costs is admissible in eminent domain proceedings. The courts in the majority often reason that admissibility of such evidence reflects the realities of current business practice, in that banks routinely insist on environmental assessments of suspect property before financing its purchase, and appraisers habitually account for potential remediation expenses in providing contingent valuations. *See* 4 Julius L. Sackman, Nichols on Eminent Domain, § 13.10 (3d ed. 2015). A significant minority of courts exclude contamination evidence, however, particularly where the landowner's liability therefor has not been established. The principal concern for the minority is that the owner will receive just compensation based on the property's depressed price, and then be compelled to bear cleanup costs equivalent to the shortfall without resort to recompense. *See id.* Courts espousing the minority view also express concern regarding the complexity of proof and the increased expense to the sovereign of litigating the matter. *See id.*

14

would be statutorily barred from recovering the excess deposited if it were compelled to defer its challenge to the circuit court's interlocutory order until an appeal of the final condemnation judgment. Moreover, the DOH's petition in this matter has given us occasion to address a new and important issue of first impression in this jurisdiction, such that the fifth *Hoover* factor also counsels our intervention. In light of the entirety of the circumstances, we adjudge that our issuance of a writ of prohibition is appropriate and warranted.

## IV. CONCLUSION

In accordance with the foregoing, we grant the petition for extraordinary relief filed by the DOH and prohibit enforcement of the circuit court's order of September 18, 2015, insofar as it conditions the right of entry and grant of defeasible title to the subject property on the agency's deposit of any amount exceeding its estimate and tender of $417,100.

Writ granted.